UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| CHERI CAUDILL, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Docket no. 1:18-cv-00164-GZS |
| KENNEBEC COUNTY, et al., | ) |
| Defendants. | ) |

**ORDER ON PENDING MOTIONS**

This case is one of three related cases brought by former female corrections officers against Kennebec County and multiple employees of Kennebec County alleging various discriminatory and illegal practices at the Kennebec County Correctional Facility. While originally brought as one case, *Huard v. Kennebec County et al.*, D. Me. Docket No. 1:16-cv-00473-GZS, the Court ordered the claims of the three plaintiffs severed after the close of discovery. Now before the Court is Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 11) and Plaintiff's Motion to File Corrected Pleadings (ECF No. 21). For reasons explained herein, the Court GRANTS Defendants' Motion and GRANTS IN PART AND DENIES IN PART Plaintiff's Motion.

**I.    MOTION FOR JUDGMENT ON THE PLEADINGS**

Before the Court turns its attention to Defendants' arguments for summary judgment, the Court considers two discrete issues for which Defendants seek judgment on the pleadings in accordance with Federal Rule of Civil Procedure 12(c). In considering these arguments, the Court has reviewed Plaintiff's Amended Complaint (ECF No. 1) and accepted all of her "well-pleaded

factual averments" and drawn "all reasonable inferences in her favor." Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998). The Court recognizes at the outset that judgment on the pleadings may be entered where the complaint fails to "contain sufficient factual matter to state a claim to relief that is plausible on its face." Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (internal citations omitted). Indeed, "[t]o cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Id. at 44–45.

First, the individual Defendants[1] seek judgment on the Plaintiff's employment discrimination claims (Counts VII-X) arguing that there is no individual liability under the respective federal and state statutes. On this point, the Court agrees with Defendants. The First Circuit has clearly held that "there is no individual employee liability under Title VII." Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009).

With respect to Maine's companion state statute, the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, this Court has previously held, "there is no individual liability under the MHRA." Charette v. St. John Valley Soil & Water Conservation Dist., No. 1:17-CV-35-GZS, 2017 WL 2683951, at *12 (D. Me. June 20, 2017) (discussing Fuhrmann v. Staples Office Superstore East, Inc., 58 A.3d 1083 (Me. 2012)). While Plaintiff has cited a 2013 guidance memorandum from the Maine Human Rights Commission[2] as offering support for individual liability after Fuhrmann, the Court does not believe this memo can override the clear case law that supports judgment as a matter of law in favor of the individual Defendants named in this case.

---

[1] The individual Defendants in this case are: Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn, Terry York, Randall Liberty, Nancy Rines, Dan Cyr, Bob Devlin, George M. Jabar II, and Patsy Crockett.

[2] See Memorandum from John P. Gause to Maine Human Rights Commission Staff (April 11, 2013), https://www.maine.gov/mhrc/guidance/memo/20130411_g.pdf (cited in Pl. Response (ECF No. 14), PageID # 519.)

See, e.g., United States ex rel. Worthy v. E. Maine Healthcare Sys., No. 14-cv-00184-JAW, 2017 WL 211609, at *32 (D. Me. Jan. 18, 2017) (concluding that "only an employer can be liable" for employment discrimination and whistle-blowing retaliation); Fisk v. Mid Coast Presbyterian Church, No. 16-cv-00490-JDL, 2017 WL 1755950, at *4-5 (D. Me. May 4, 2017). Thus, the Court concludes that each individual Defendant is entitled to judgment on the pleadings as to Plaintiff's statutory employment discrimination claims (Counts VII-X).

Next, Defendants seek judgment on the pleadings as to Count XVI, which Plaintiff's First Amended Complaint describes as "criminal liability of Kennebec County, Kennebec County Sheriff's Office and its Corrections Division, Kennebec County Correction Facility, Kennebec County Commissioners and Kennebec County Administrator" and cites 17-A M.R.S.A. § 60, a state statute that defines when an organization may be found guilty of a crime. (First Am. Compl. (ECF No. 1), PageID # 85). As framed, this Count fails to state a claim upon which Plaintiff could recover any relief in the context of this civil case. See, e.g., Larrabee v. Penobscot Frozen Foods, Inc., 486 A.2d 97, 101 (Me. 1984). To the extent that Plaintiff has argued that Count XVI should be read to state a plausible civil RICO claim, the Court notes that Plaintiff's RICO claims are captured in Counts XIII-XV.

Therefore, the Court grants Defendants' request for judgment on the pleadings as to all Defendants on Count XVI and as to the individually named Defendants on Counts VII-X. The Court next considers Defendants' request for summary judgment on Plaintiff's remaining claims.

## II.   MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment

4

for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

B.     **Factual Background**

Defendant Kennebec County[3] is ultimately overseen by three elected county commissioners, Patsy Crockett, Nancy Rines, and George Jabar, each of whom is named as a Defendant in this case in both their individual and official capacities. The day-to-day administration of Kennebec County is handled by County Administrator Bob Devlin and Human Resources Manager Terry York, both of whom are likewise named as individual Defendants in this case. The County Commissioners promulgate and amend the Kennebec County Administrative Regulations, which serve as the internal policies for the county.

Defendant Kennebec County Sheriff's Office operates as a department within the county government run by an elected Sheriff. During the time period relevant to this case, Defendant Randall Liberty was the Kennebec County Sheriff and Defendant Ryan Reardon served as his Chief Deputy. Within the Sheriff's Office, there is a Corrections Division that operates the county jail, also known as the Kennebec County Correctional Facility ("KCCF"). Various KCCF employees make up the remainder of the individually named Defendants in this case, including Marsha Alexander, Laura Briggs, Calista Campbell, and Dan Cyr. During the time period

---

[3] Plaintiff has separately named as Defendants various entities that fall under the umbrella of Kennebec County, including Kennebec County Sheriff's Office, the Corrections Division, Kennebec County Correctional Facility (together with Kennebec County, the "Kennebec County Defendants"). The Court considers any claims against these entities as claims against Kennebec County. See Allen v. York Cty. Jail, No. CIV. 01-224-P-C, 2003 WL 221842, at *7 (D. Me. Jan. 30, 2003), report and recommendation adopted, No. CIV. 01-224-P-C, 2003 WL 848287 (D. Me. Mar. 5, 2003) ("[S]uits against municipal subdivisions . . . are in essence suits against the municipality.")

relevant to this case, all KCCF employees were required to follow the rules laid out in the KCCF Policy & Procedures Manual, which was subject to annual review and revision.

Plaintiff Cheri Caudill was employed at KCCF from March 18, 2013 until September 17, 2014. Caudill was not a member of the union during this term of employment and did not otherwise have a written employment contract with Kennebec County.[4] She was initially hired as a Clerical Specialist for the Corrections Division of the Kennebec County Sheriff's Office. In this position, she served as one of four mail clerks at the KCCF. The other three mail clerks were: Jessica Quinn, Darlene Wallace, and Amanda Morgan. Quinn and Caudill were full-time, and Wallace and Morgan were part-time employees.

As a Clerical Specialist, Caudill's immediate supervisor was Louis Schimke. Schimke chose Quinn to be Caudill's field training officer because Quinn was the only other full-time mail clerk and she knew the job duties of the position Caudill was filing. Despite her role in training Caudill, Quinn was Caudill's co-worker, not her supervisor.

When she began working for Kennebec County, Caudill was invited to eat lunch with her co-workers, including Quinn. Quinn maintained friendships with multiple other female employees at the jail, including a longstanding personal friendship with Lieutenant Calista Campbell that pre-dated their working relationship. Campbell and Quinn were also friends with Captain Marsha Alexander and Sergeant Laura Briggs. Because of these friendships, other employees viewed all four women (Alexander, Briggs, Campbell & Quinn) as having "certain perks" as well as the ability to influence how the facility was run. (Heavey-Morin Dep. (ECF No. 13-25), PageID #

---

[4] Plaintiff disputes why she was not a member of the union and suggests that perhaps she should have been allowed to join the union after completing her probationary period. See Pl. Response SMF (ECF No. 13), PageID # 280. However, this underlying issue is not material to her claims. The Court also deems it admitted that "Caudill did not have an employment contract with Kennebec County" based on Plaintiff's failure to support her denial with any record citation. See Def. SMF (ECF No. 12) ¶43, Pl. Response SMF ¶43 & D. Me. Local Rule 56(c).

6

398.) According to at least one other employee, "Marsha Alexander was running the show" inside the jail during this time period with "limited supervision." (Morin Dep. (ECF No. 13-28), PageID # 483.) On several occasions early in Caudill's employment, Briggs, Quinn and Campbell invited Caudill to accompany them on off-duty social gatherings and requested that they exchange cell phone numbers.

On November 4, 2013, Caudill began training for the corrections officer certification. Caudill's same gendered partner, Heather Roesger, was also enrolled in training for corrections officer certification during this time. Given their relationship, Schimke told Caudill and Roesger to make sure they weren't taking breaks together and they were keeping everything separate. They were also told that any time they were training together or working the same shift, they had to work different floors. Caudill and her partner complied with these directives.

In early November 2013, Campbell asked the Sheriff's Office of Professional Review ("OPR") to investigate whether Caudill may have violated certain rules related to the handling of inmate mail. Caudill cooperated with this investigation and answered questions. Ultimately, the allegations were determined to be "unfounded" and the OPR investigation was closed. (Pl. Ex. 4 (ECF No. 13-4), PageID #s 298-303.)

By December 2013, about a month into her corrections officer training, it became known to various employees, including Quinn, that Caudill was in a relationship with a woman. Prior to that time, Caudill had heard Jessica Quinn make a comment that one lesbian couple was going to make gay babies. In the same timeframe, Caudill heard Quinn make a comment that another lesbian co-worker adopted a crack baby because she couldn't have her own. (See Caudill Dep. (ECF No. 12-9), PageID #s 208-09.) Against this backdrop, Caudill viewed some of her co-workers as homophobic. Caudill was not alone in this view, sometime in 2012 or 2013, another

7

lesbian employee overheard Lieutenant Ryan Reardon say he was "going to get rid of all lesbians."[5] (Dumas. Dep. (ECF No. 13-24), PageID #s 385-87.) However, Caudill was not aware of this comment during her term of employment.

Throughout her employment, Caudill overheard comments about other officers and their sexual preferences and things that happened sexually in the jail and outside of the jail. However, no one made unwanted sexual advances toward Caudill. Also, she was never the recipient of unwanted touches, hugs, kisses, requests for dates, or anything of that nature. Caudill also acknowledges that she was not the recipient of any unwanted requests for sexual activity or any suggestion that if she provided some sort of sexual act or participated in a sexual act, she would get anything in return.

**Caudill's Corrections Officer Training**

As part of her training to become a corrections officer, Caudill received training on various procedures from a field training officer who then recorded an assessment of Caudill's work. In Daily Field Training Sheets dated December 23, 2013 through January 5, 2014, Caudill received reviews from two different training officers, who assessed her as having acceptable or superior skills on all covered topics and commended her on various aspects of her work. (See Pl. Ex. 17 (ECF No. 13-17), PageID #s 356-75.)[6] Sergeant Briggs and Lieutenant Campbell reviewed these training sheets. Ultimately, later in 2014, Caudill became certified as a corrections officer.

---

[5] The long-term employee, Bobbi-Joe Dumas, did not immediately report this comment but later reported it to a co-worker around the Spring of 2015. (Dumas Dep., PageID #s 388-89.) Dumas worked at KCCF from January 9, 1995 until August 8, 2013. She held the rank of sergeant when she left her employment.

[6] To the extent Defendants have objected to these training sheets as "inadmissible hearsay," Def. Reply SMF, PageID # 582, the Court overrules that objection. See F.R.E. 801(d)(2), 803(1) & (6).

**Caudill's Other Performance Evaluations**

In addition to the evaluations Caudill received as part of her corrections officer training, Caudill also received regular performance evaluations from Schimke. In her first performance evaluation covering March 18, 2013 to December 30, 2013, Schimke found Caudill was fulfilling all of her job duties. In reviewing the evaluation, Captain Alexander noted that Caudill was "a fabulous addition to the Corrections Division." (Joint Ex. 1 (ECF No. 9-1), PageID # 133.) Also, in 2013, Caudill was one of three employees to receive a favorable memo from Schimke recognizing her assistance with an on-site blood drive.[7]

On April 28, 2014, Caudill received a memo from Schimke listing nine items of concern regarding her job performance. The issues of concern were compiled while Caudill had been absent for a six-day period. Caudill was given a corrective action plan and a meeting was scheduled to discuss what improvement had been made. (See Joint Ex. 2 (ECF No. 9-2).) When Schimke presented the memo to Caudill, Schimke believed that all of the performance concerns were legitimate. Caudill provided Schimke two written responses to this memo acknowledging some mistakes and outlining what she would do differently going forward. (See Pl. Exs. 2 & 3 (ECF No. 13-2 & 13-3).) After this first write-up, Caudill went through a re-training period during which she had to have someone supervise her.

Schimke completed another job performance evaluation of Caudill for the period covering January 1, 2014 through June 13, 2014. This evaluation noted that Caudill has faced "numerous and concerning performance issues" during this period of time, but commended Caudill for working to address those issues. (Joint Ex. 3 (ECF No. 9-3), PageID # 142.) Upon

---

[7] Additionally, Caudill's personnel record includes an undated letter of appreciation from Sheriff Liberty and an undated letter of recommendation from Cpl. St. Pierre, both of which commended Caudill for her work and noted that she had assisted in the protection of victims of domestic violence. (Pl. Exs. 14 & 15 (ECF Nos. 13-14 & 13-15).)

9

her review of the evaluation, Captain Alexander added supportive remarks.

On March 10, 2014, Terry York, as Human Resource Manager for Kennebec County, indicated on a Request for Verification of Employment from The Bank of Maine, that the probability of continued employment for Cheri Caudill was "excellent." (Pl. Ex.18 (ECF No. 13-18).) On April 23, 2014, York completed a Fannie Mae Request for Verification of Employment from Mortgage Network, Inc., on which she indicated the probability of continued employment for Cheri Caudill was "good." (Pl. Ex. 19 (ECF No. 13-19).)

On September 12, 2014, Schimke wrote another memo to Caudill detailing two separate issues with incoming mail; at least one of which had been brought to Schimke's attention by Quinn. Schimke explained that the memo was "a written reprimand and if another performance issue of this kind occurs, it will likely lead to further disciplinary action, to include suspension or a discharge from your job duties." (Joint Ex. 4 (ECF No. 9-4), PageID # 146.)

Five days later, on September 17, 2014, Schimke wrote yet another memo to Caudill, which detailed "four concerns [that] were identified by [Caudill's] peers" during Caudill's absence on the prior day. (Joint Ex. 5 (ECF No. 9-5), PageID # 147.) Schimke spoke to Caudill at that time and stated, "We can go through [the issues itemized in the memo], Cheri, but ultimately, you're no longer an employee." (Schimke Dep. (ECF No. 12-12), PageID # 264.) With that, Caudill's employment was terminated effective that same day. Ultimately, Caudill was terminated from her position at Kennebec County by Schimke with approval from the jail administrator and human resources. At the time of her termination, she was a probationary employee for the corrections officer job because she had not been in that position for more than one year.

Caudill was never disciplined other than the write-ups from Schimke which led to her

termination. Caudill maintains that Quinn made all of the allegations that resulted in Schimke's write-ups after Quinn learned that Caudill was a lesbian. However, Caudill never made any report of harassment to a supervisor prior to her termination.

After her termination, Caudill applied for unemployment compensation. Kennebec County disputed Caudill's right to unemployment compensation, however, after investigation, the Maine Department of Labor concluded that Caudill did not engage in misconduct and was eligible for unemployment benefits. (See Pl. Ex. 13 (ECF No. 13-13).)

Caudill has never filed a complaint with the Maine Human Rights Commission or the EEOC.

### C. Discussion

Defendants seek summary judgment on all of Plaintiff's remaining claims. These claims essentially fall into three categories: (1) RICO (Counts XIII, XIV & XV), (2) breach of contract (Count XI), and (3) statutory discrimination (Counts VII, VIII, IX & X). The Court considers each of these three categories of claims in turn.

#### 1. RICO Claims

While the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, is widely known as a tool for criminal prosecution of organized crime, the statute also has "a generous private right of action" for plaintiffs who can prove "they were 'injured in [their] business or property by reason of a violation of section 1962.'" Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 527 (1st Cir. 2015) (quoting 18 U.S.C. § 1964(c)). As relevant here, "[t]o state a civil RICO claim, . . . a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through . . . a pattern ... of racketeering activity." Id. at 528 (internal citations and quotations omitted). A "pattern" of racketeering "requires a plaintiff to show that at least two acts of

racketeering occurred within ten years of each other." Id. (citing 18 U.S.C. § 1961(5)). While many types of illegal activities fall under RICO's definition of racketeering, found in 18 U.S.C. § 1961(1), Plaintiff's briefing in this case asserts Defendants' racketeering consisted of "violation of the Hobbs Act, theft by extortion and bribery in official and political matters in violation of state criminal statutes."[8] (Pl. Response (ECF No. 14), PageID # 535.)

As the First Circuit has previously explained, "While it may be theoretically possible to allege a wrongful discharge which results directly from the commission of a RICO predicate act . . . any such safe harbor would be severely circumscribed." Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (quoting Miranda v. Ponce Federal Bank, 948 F.2d 41, 41 (1st Cir. 1991)). As noted in Camelio, RICO claims arising from employment disputes have frequently failed to survive even a motion to dismiss. See id. (noting this was the "fourth time in recent years" such a dismissal was affirmed). In this case, the Court must consider whether Plaintiff has any trialworthy RICO claim based on her allegations that "lesbian personnel at Kennebec County were under constant threat of losing their jobs" and, in fact, lost their jobs as a result of "extortion" by Defendants. (Pl. Response, PageID # 537.)

On the record presented, Plaintiff cannot pass over two critical hurdles to survive summary judgment on her RICO claims. First, Plaintiff has not presented trialworthy evidence that Caudill's job loss was proximately caused by any of the predicate acts she alleges. RICO "requires proof that at least one of the defendant's predicate acts was the proximate cause of the plaintiff's injuries." Camelio, 137 F.3d at 670. Here, the undisputed evidence is that Caudill's immediate

---

[8] To the extent that Plaintiff alleges "numerous" other violations of federal and state law that qualify as racketeering for purposes of RICO, Plaintiff has failed to present any argument or evidence that would support a trialworthy claim based on these alternatively alleged acts of racketeering. Additionally, Defendants correctly assert that many of the actions alleged in the Amended Complaint do not qualify as enumerated crimes for purposes of 18 U.S.C. § 1961. (Pl. Response, PageID # 535 (citing the Am. Compl. ¶¶ 303, 324, 325, 328); Defs. Motion, PageID #s 166-167.)

supervisor, Schimke, terminated her employment after she documented a series of alleged performance deficiencies by Caudill. The trialworthy evidence that any extortion by a named Defendant proximately caused Caudill's September 17, 2014 termination is simply lacking.

Second, even viewing the record in the light most favorable to Plaintiff, there is simply not trialworthy evidence of two separate acts of extortion. See 18 U.S.C. § 1961(5) (laying out requirement of two acts of racketeering within a ten year period). Under the Hobbs Act, an act of extortion requires that transferable property move from the victim into the possession of the extortionist. Sekhar v. United States, 570 U.S. 729, 734 (2013) (concluding that a favorable recommendation did not qualify as "obtainable property" under the Hobbs Act). Maine law appears to similarly require that extortion can only occur when a person "obtains or exercises control over the property of another." 17-A M.R.S.A. §§ 352(1) & 355. Plaintiff asserts a property right in "her right to employment free of discrimination." (Pl. Response, PageID # 537). She fails to present evidence that would allow a factfinder to conclude that any of the named Defendants actually obtained her job, such that they were able to control this property interest and pass it to another person. Thus, even assuming that a factfinder might conclude that one or more of the Defendants took actions that contributed to Caudill losing her position with Kennebec County, the record does not support a finding that the job itself was obtainable property.

Therefore, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's RICO Claims (Counts XIII, XIV & XV).

**2. Breach of Contract Claims**

In Count XI, Plaintiff asserts breach of contract based on three different alleged contracts: (1) the union contact (Count XI(A)), (2) the KCCF Policy & Procedure Manual and Kennebec County Administrative Regulations (Count XI(B)), and (3) the Kennebec County Administrative

Regulations, specifically Regulation No. 04-04-02 pertaining to restrictions on hiring relatives (Count XI(C)). Defendants seek summary judgment on all three theories.

As to Count XI(A), Defendants argue that Caudill was not a party to the union contract because she was not a member of the union. It is in fact undisputed that Caudill was a not a member of the union during her term of employment. Thus, based on the summary judgment record, Plaintiff has failed to present evidence that would allow a factfinder to conclude that she was a party to the union contract and that the contract was breached in connection with her termination. Therefore, Defendants are entitled to summary judgment on this breach of contract claim.

As to Count XI(B) & (C), Defendants argue that Plaintiff cannot pursue a breach of contract claim based on the KCCF Policy & Procedure Manual[9] or the Kennebec County Administrative Regulations[10] because such policies do not create an enforceable employment contract. Defendants cite Taliento v. Portland W. Neighborhood Planning Council, 705 A.2d 696, 700–06 (Me. 1997) in support of this argument. In Taliento, the Law Court found the personnel policy at issue did not create an employment contract and affirmed summary judgment in favor of an employer. See id. at 699 (citing Libby v. Calais Reg'l Hosp., 554 A.2d 1181, 1183 (Me. 1989)). This Court has previously considered Taliento, along with earlier related cases from the Law Court, and described Maine's case law regarding when employee handbooks and policies amount to employment contracts as a "quagmire." Barrera v. Town of Brownville, 139 F. Supp. 2d 136, 141 (D. Me. 2001).[11] However, in this case, the briefing and the record do not provide any basis

---

[9] At least an excerpt of the Manual is contained in the summary judgment record at ECF No. 13-9.

[10] Copies of the applicable regulations are contained in the summary judgment record at ECF Nos. 12-7 & 12-8.

[11] In Barrera, this Court acknowledged that the Law Court had previously held "that various employee manuals were not contracts on the grounds that the restrictions on the employer's right to terminate were not clearly stated." See id. at 141. However, the Court went on to apply two other precedents and conclude that in Barrera's situation "the

for the Court to wade into this quagmire. Rather, Plaintiff has failed to offer any response to Defendants' argument and thereby waived any possible contract claim premised on a breach of these various regulations and policies. See, e.g., Berry v. City of S. Portland, Me., 525 F. Supp. 2d 214, 233 (D. Me. 2007) (similarly concluding defendant was entitled to summary judgment based on plaintiff's "fail[ure] to substantiate the claim to any extent" at the summary judgment stage); see also Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir.1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (citations and internal quotation marks omitted).

### 3. Discrimination Claims

Having winnowed Plaintiff's case down to a classic employment discrimination case, the Court is left to consider the following claims: (1) sexual orientation discrimination in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4572 (Count VII), (2) gender discrimination in violation of the MHRA and 42 U.S.C. § 2000e-2(a)(2) ("Title VII") (Count (VIII), (3) a hostile work environment in violation of the MHRA and Title VII (Count IX), and (4) sexual harassment in violation of the MHRA and Title VII (Count X). Defendant Kennebec County seeks dismissal of these discrimination claims primarily based on Caudill's failure to exhaust administrative remedies.

The Court's analysis of this argument begins with the undisputed fact that Caudill has never filed any administrative charge regarding her now pending claims. "Title VII requires, as a predicate to a civil action, that the complainant first file an administrative charge with the EEOC

---

Personnel Policy created a unilateral employment contract for an indefinite period of time under which Barrera clearly could only be terminated for 'good and sufficient cause.'" Barrera, 139 F. Supp. 2d at 142 (citing Mercier v. Town of Fairfield, 628 A.2d 1053 (Me. 1993) & Cummings v. S. Portland Hous. Auth., 985 F.2d 1 (1st Cir. 1993)). In the Court's view, the summary judgment record here is not analogous to Barrera.

within a specified and relatively short time period (usually 180 or 300 days) after the discrimination complained of, 42 U.S.C. § 2000e–5(e)(1), and that the lawsuit be brought within an even shorter period (90 days) after notice that the administrative charge is dismissed or after the agency instead issues a right-to-sue letter . . . ." Clockedile v. New Hampshire Dep't of Corr., 245 F.3d 1, 3 (1st Cir. 2001). Simply put, "a federal court will not entertain employment discrimination claims brought under Title VII unless administrative remedies have first been exhausted." Rodriguez v. United States, 852 F.3d 67, 78 (1st Cir. 2017) (citing Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009)). Therefore, the Court concludes Defendants are entitled to summary judgment on any federal claims asserted by Plaintiff in Counts VIII-X.[12]

Defendants likewise argue that Plaintiff's MHRA claims required administrative exhaustion. Defendants' Motion specifically quotes from 5 M.R.S.A. § 4622, which, in relevant part reads: "Attorney's fees under section 4614 and civil penal damages or compensatory and punitive damages under section 4613 may not be awarded to a plaintiff in a civil action under this Act *unless the plaintiff alleges and establishes that, prior to the filing of the civil action, the plaintiff first filed a complaint with the commission* . . . ." Id. (emphasis added). When, as is the case here, Plaintiff only seeks monetary damages of the varieties listed in section 4622 and has not filed with the commission, the case law clearly supports dismissal of the MHRA claim as moot. See, e.g., Schoendorf v. RTH Mech. Contractors, Inc., No. 2:12-CV-00179-GZS, 2012 WL 3229333, at *6 (D. Me. Aug. 6, 2012) ("Failure to satisfy the requirements of § 4622 when Schoendorf seeks only attorneys' fees and damages under the MHRA renders her MHRA claim moot because Schoendorf cannot be afforded any effective relief on her claim.")

---

[12] Presumably, the clarity of this exhaustion requirement explains why Plaintiff mounts no Title VII-specific argument to Defendants' request for dismissal of her federal discrimination claims for failure to exhaust. In any event, Plaintiff's failure to respond means her federal discrimination claims are alternatively subject to dismissal due to waiver.

Plaintiff argues that her MHRA claims fall within an exception to the exhaustion requirement because her MHRA claims were "joined with a claim that does not require exhaustion of administrative remedies." (Pl. Response (ECF No. 14), PageID # 526.) Plaintiff is correct that section 4622 contains an exception, such that remedies are not limited "for civil actions filed under subchapter 5 [5 M.R.S.A. § 4591 et seq.] if one or more additional causes of action are alleged in the same civil action that do not require exhaustion of administrative remedies or subchapter 4 if the allegations are covered by the federal Fair Housing Act, 42 United States Code, Chapter 45." 5 M.R.S.A. § 4622. Plaintiff is also correct that the First Circuit applied this exception in Dudley v. Hannaford Bros. Co., 333 F.3d 299, 312 (1st Cir. 2003), and thereby allowed Mr. Dudley to access the "full panoply of statutory remedies" of MHRA remedies despite his untimely filing with the MHRC. Id. at 312 & n.6. However, Mr. Dudley's MHRA claim was of one of the two "genres" explicitly listed in section 4622's exception language, namely, he had a public accommodation claim. Id. Here, Plaintiff brings MHRA claims under subchapter 3 "comingled with . . . breach of contract and RICO claims." (Pl. Response, PageID # 526.) The Court does not read the exception language of section 4622 to exempt such MHRA claims from the statute's clear limitation on recovery. Thus, the Court concludes that Plaintiff's MHRA claims are moot because the Court simply cannot award her any of the relief she seeks given her failure to comply with the requirements of 5 M.R.S.A. § 4622.

The Court declines to address Defendants' alternative arguments for dismissal of Plaintiff's discrimination claims. Rather, in light of its conclusions regarding the impact of Plaintiff's failure to seek any administrative remedy, the Court readily concludes Defendants are entitled to summary judgment on all of Plaintiff's remaining claims.

## III. MOTION TO AMEND

The parties completed briefing the just-discussed dispositive motion according to a customized briefing schedule on August 23, 2018. On September 7, 2018, Plaintiff filed her Motion to File Corrected Pleadings (ECF No. 21). By way of a terse explanation for her request to correct her prior filings, Plaintiff's Counsel acknowledged that she "made errors . . . which if not corrected, may cause Plaintiff to lose viable claims" and asserted that Defendants "will not be prejudiced" by the amended filings. Not surprisingly, Defendants disagreed with that assessment and have objected to Plaintiff's Motion to File Corrected Pleadings.

To be clear, what Plaintiff primarily seeks to "correct" is her responsive statement of material facts. Her original Opposing Statement of Material Facts (ECF No. 13) was a twenty-page document filed on August 3, 2018. It included twenty-eight additional facts, which Defendants then responded to via their Reply Statement of Material Facts (ECF No. 20). Her Amended Opposing Statement of Material Facts (ECF No. 21-1) is a twenty-one page document that adds sixteen additional material fact paragraphs. See id. at PageID #s 605-607. She also then proposes to amend her brief in opposition to Defendants' Motion (ECF No. 21-2) and add additional excerpts from Caudill's deposition testimony totaling seventeen pages (ECF Nos. 21-3 & 21-4).

On the record presented, the Court finds no good cause or excusable neglect to justify allowing Plaintiff's untimely request to substitute her proposed corrected responses. The Court also finds that Defendants would be prejudiced by the Court allowing Plaintiff to present additional statements of material fact and deposition testimony without allowing Defendants an opportunity to respond. Moreover, in an abundance of caution and to ensure the just resolution of the pending Motion, the Court acknowledges that it has reviewed all of the supplemental excerpts of deposition

18

testimony attached to Plaintiff's Motion,[13] along with the entire summary judgment record, and determined that allowing the record supplementation would not change the analysis and ruling contained in this Order. Thus, to the extent that the Court has reviewed and considered the supplemental record submitted (ECF Nos. 21-3 & 21-4), Plaintiff's Motion is GRANTED IN PART. However, the Court DENIES the Motion to the extent it seeks to substitute the attached Amended Opposing Statement of Material Facts (ECF No. 21-1) and the Amended Response in Opposition to Defendants' Motion (ECF No. 21-2) in place of Plaintiff's earlier filings (ECF Nos. 13 & 14).

## III. CONCLUSION

Therefore, the Court hereby GRANTS Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 11) and GRANTS IN PART and DENIES IN PART Plaintiff's Motion to File Corrected Pleadings (ECF No. 21).

SO ORDERED.

                                                /s/ George Z. Singal
                                                United States District Judge

Dated this 19th day of March, 2019.

---

[13] The Court notes that at least some of the Caudill deposition excerpts submitted in ECF Nos. 21-3 & 21-4 duplicates previously submitted excerpts that were filed by Defendants in support of their Motion. See, e.g., Caudill Dep. (ECF No. 12-9), PageID #s 203-225.